[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: VISITATION
The parties to this action are the parents of Austin Daniel Beardsley, born August 23, 1990. The parties were never married, nor was the issue discussed despite the impending birth of their child. The defendant father seeks unsupervised visitation.
The defendant admitted that he had asked her to terminate the pregnancy, due in part to his claim that she did physically harmful things to the child, like smoking, overwork, and drinking. The plaintiff denied that she engaged in these activities during the pregnancy. He claimed that he did not feel that she was capable of raising a child on her own, and in an attempt to "enlarge" the conversation, asked what she would do if her child came home from school to disclose that he had been sodomized. This conversation admittedly occurred prior to the birth of the child. He admitted that he and his sister had been in therapy, and that his sister had claimed incest and substance abuse within their family of origin. He denied that there was a history of sexually abusive behaviors within that family, but that there was a history of "abuse" and conceded that there was alcohol abuse. CT Page 11128
The plaintiff mother claims that the defendant disclosed that he had been abused and that he had told her that he was fearful that he might repeat that conduct and endanger the well-being of the child. The lack of a relationship between the parties, and these fears, seems to have fueled this conflict over whether or not the father should have unsupervised contact with the child.
The foreign judgment, filed with this court, contains a Parenting Plan and Schedule, which discloses the substance of the conversation between the parties and the counselor attached to the court in California. The report indicates that the defendant did admit to the substance of those abuse allegations within his family of origin. His denial on this record is not credible.
After the birth of the child, he claimed that Lois would not let him see the child, and would run away from him. He claimed that he made several efforts to contact her. He admitted that he did not financially support the child. He claimed that she would not engage in any conversation concerning this issue. It was clear from his testimony that he was absent from their lives after the birth of the child, and that he provided no emotional support to the plaintiff.
The defendant testified that he only saw the child when he happened to observe the plaintiff and the child in a car on a public street in San Diego. He was not at the birth of the child, insofar as he had stopped seeing the plaintiff during the pregnancy.
The defendant insisted on a blood test to determine the paternity of the child when plaintiff ultimately brought a paternity action to establish payment of child support for the child. The blood test confirmed paternity, and the defendant has been paying monthly child support of Four Hundred, Sixty ($460.00) Dollars per month by wage execution. There had been periods of non-payment. During those periods of non-payment, the plaintiff did, however, travel to California at her own expense, pursuant to the court order, so that the defendant could visit with the child. CT Page 11129
The defendant father did have visits with the child in July of 1991 and 1992, during a one week period when the mother returned with the child from Connecticut to California. Mother supervised those visits. In 1993, there was a spring period of two weeks time when the father could visit with the child. He saw the child during Christmas of 1994. The visitation has been fitful, and difficult for the parties to effect. The court can only imagine the horror it must be for the child.
The defendant had telephone contact with the child for a period of time after the parties were in court, and was told by the child that his grandmother was standing over him and that he was uncomfortable talking on the phone with dad. The mother denied that allegation. The father thereafter did not exercise his option to have telephone calls with the child. He claimed that he was to call on Sundays. He did not fully exercise his option to call. The court cannot find from the evidence on this record that the plaintiff caused the defendant's decision to stop calling. It appears, rather, that he elected to stop calling because of the stress it caused to him. The impact of that failure on the child did not seem to occur to the defendant.
The defendant claims that the child suffers from "failure to thrive syndrome." He seeks to be informed of medical records and treatment. The child is five and weighs only twenty-six pounds.
He seeks Thanksgiving and Christmas visitation, which is the only time he has left of his annual vacation time. He seeks Thanksgiving visitation from 8 p. m., until the Sunday following at noon. He further seeks visitation from December 26, 1995 until Sunday, December 31, 1995, or a bit longer. He understands that there is concern that he is moving too quickly in his demands, insofar as his time with Austin has been supervised and few and far between.
He would propose unsupervised visits and would remain in the State of Connecticut so that the child could return during the period to his mother if he felt the need. If the court ordered supervised visitation, he CT Page 11130 asked that it be supervised by someone other than a member of the plaintiff's family. He suggested that the person be one Valerie Hume, an accountant in her fifties, who resides in Woodbridge, Connecticut. The defendant is an uncle to eleven (11) year old Luke Wilson, who has visited him in California from Portland, Oregon for approximately one week this summer. The defendant would like to share some of the same kinds of activities with Austin. The defendant lives alone in California.
The defendant claims that Dr. Frazao, his long term therapist and he have dealt with the issues of familial abuse, leading the California court to conclude (see order of October 24, 1994) that the defendant had complied with all of the conditions required of him for unsupervised visitation.
The defendant conceded in cross-examination that he had followed the plaintiff and the child from Kent to the Danbury Fair Mall, and did so until the plaintiff would stop and talk to him. He stated that he wanted to say goodbye to the child before he left for California, and that the plaintiff had not been available for him to do that.
The defendant called Dr. Susan Moyer, a pediatric gastroenterologist at Yale University. She did see the child, who had "fallen off his growth curve." His weight gain had plateaued, and he was referred by his pediatrician. She wrote a letter (Defendant's Exhibit 2) concerning the proposed examination and treatment for failure to thrive. The defendant introduced two other reports of treatment in the form of letters (Defendant's Exhibit 3 and 4). The medical tests indicated no organic cause of his condition, and the recommendation consisted of appetite supplements and psychological assessment. The witness also indicated that the mother may have "blunted" his appetite by breast feeding him prior to meals. The extent and timing of breast feeding was altered after the referral to Dr. Moyer. The mother did try some supplements, but expressed concerns surrounding the non-organic nature of those.
The plaintiff called Dr. David Begelman. He has seen Austin Beardsley approximately seven (7) times with CT Page 11131 respect to the issues surrounding visitation. His file consists of medical and psychological reports, as well as orders from the California and Connecticut court files. He has met with Ms. Beardsley and her mother. All of his information if from the plaintiff, and health providers for the child. The defendant has had no input into his evaluation.
His sessions commenced on July 25, 1995. He opined that he would favor, based upon meetings with some of this family, that there be more not less contact between the father and the son. Their relationship should be built up and fostered on a slow and consistent basis. Austin's welfare would be best served if the visitation occurred on a supervised basis at present. Long-term the vists [visits] would be best unsupervised, for a longer time and at the father's home in California.
The witness felt that the defendant should engage in supprotive [supportive] therapy to help him work through the frustration of waiting for the relationship to be fostered, and to help him work through predictible problems between parents in these situations.
The witness indicated that he spoke to Austin concerning his father outside of his mother's presence. Austin first said he had no father. He has confusion concerning identification of the defendant as his father. On cross-examination, the witness could not testify as to why the child would say that he had no father. The child impresses the witness as bright, articulate, and has good interpersonal skills. He has certain problems relating to his size. Family Services also recommends a progression of visitation. He indicates that he does not have serious disagreement with the recommendation of Family Services. The witness opposes unsupervised visitation with the child immediately. His concerns surround his style, in that he gratifies his own needs by precipitous, immature, manipulative, and impulsive conduct. The witness was concerned about the impact of demands the defendant might make on the child. Any conduct and opinion based on conduct, was reported to the witness by the plaintiff, not by the child.
The witness reviewed reports concerning the psycho-social CT Page 11132 history of the defendant. The witness did not interview the defendant so he was hesitant in forming an opinion concerning the safety issues previously discussed. The court finds that the failure to interview the defendant makes any attempt at an opinion of no value to the court.
The witness said that the reliability of the supervisor, rather than the child's knowledge or familiarity with the person, was of consequence in a decision of who would be a supervisor.
The witness testified that while the child said he did not have a father, that the plaintiff had traveled to California and had attempted to make telephone contact with the defendant, and was rebuffed on several occasions. He testified that during his conversations with the Beardsley family that there had never been an indication that they sought to deprive the child and father from a relationship.
The attorney for the minor child called Veronica Horton, Family Services Counselor, who authored the report, now Child's Exhibit 1. The report includes the interstate study from California, as well as Ms. Horton's recommendations concerning the reestablishment of a father-son relationshipp [relationship] over time. The report is consistent with the observations of Dr. Begelman, and is supported by the attorney for the minor child. The defendant judicially acknowledged agreement with the report. The court is at a loss to determine what the plaintiff was seeking to achieve by a hearing. The report recommends phased-in visitation, with supervision for a period of time, then visitation within the State of Connecticut, a referral of the parents to a psychologist to assist them in making more long-term plans for visitation, and ultimately recommends that the child spend time in California with his father.
The fact that the plaintiff required a hearing leads the court to conclude that the assessment for attorney's fees for the minor child for the hearing shall be borne exclusively by the plaintiff.
The defendant called Valerie Hume, previously CT Page 11133 identified as a prospective supervisor for visitation. She met the defendant in San Diego through the course of their respective employments. She resides in Connecticut. She is an accountant and a gemologist. She did recall seeing the parties and the child briefly at the Sheraton Hotel when the mother and child were in California. She testified that she would gladly supervise the visitation. She resides in Woodbridge with her mother. She indicated that she would take action if the defendant was abusive, or if he threatened to remove the child out of the State of Connecticut.
The plaintiff called Arla Trusiewicz. She resides in Torrington, where she is in the drapery and decorating business. She has a nine year old child, and is available to supervise visitation. She has a flexible schedule, and would be willing to work with the parties to accommodate the child. She has known the plaintiff for a number of months from a book reading/study group. She concedes that the plaintiff has said unfavorable things concerning the defendant, but she said she has faith that people can improve. Attorney McCormick knows the witness and approved of the suggestion that she could supervise visitation.
The plaintiff ultimately took the stand, after the court accommodated the professional witnesses. She described the difficulties with stress in her life, and that the first indication of low weight gain for the child occurred when she was moving from California to Connecticut. She described her compliance with recommendations of Dr. Moyer, and said that the child simply does not eat alot.
She claims that the child is bright academically, and that he has attended nursury [nursery] school for the last two years at Morning Song in Sharon. With respect to his knowing who his father is, the witness claimed that she initiated visits with the child, and that she had asked for a picture, but that he refused. When she brought the child back to California for a visit in 1991, she claimed that she told Austin that they were going to visit his father. The child was just beginning to speak. That visit occurred just prior to their court hearing on paternity. That was repeated in 1992 and 1993, and she CT Page 11134 testified that she saw to it that Austin sent a Father's Day card each year.
At Christmas in 1993, the child received no gifts from his father. In 1994, the defendant came with a girlfriend to visit at her mother's house, and they gave Austin some presents. That visit was not court-ordered, but arranged by the plaintiff. She claimed that she had not said anything negative concerning the father, but if the child asked about why his father had not sent something that was promised, or called when he said he would, she would not cover for him.
She maintained that she remained concerned about the defendant's caregiving capabilities because of his disclosure of familial sexual abuse. She understands that his disclosure to her was painful, and she testified that he could not guarantee that he would not be sexually aroused by a child. She did not thing that she could help him get through those issues, because of her limited knowledge. In December when she told him she was pregnant, just before Christmas, she claimed that he became more distant and they broke up. She testified that he wanted her to have an abortion. Their history as a couple, and her disappointment and hardship in bearing the child, is being visited upon this child. She testified that she was being tormented in the pregnancy, and when she decided to go through with the paternity action, it was for the child, so that he would know his father. She claimed as well that he has continued to threaten her with taking the child away, so that she desires supervised visitation.
After the January 1995 hearing, the parties arranged for Sunday evening telephone calls. By the family services meeting in the beginning of June, the defendant had called less than fifty (50%) percent of the time. She claimed that he was argumentative. The plaintiff's testimony was consistent with many of the reports of contacts in the California study concerning the defendant's level of maturity. The testimony also describes a non-functional relationship between two adults who happen to have produced a child.
The plaintiff does not want the child to be CT Page 11135 disappointed by the defendant's sporadic involvement. She claimed that he comes in and out of Austin's life, and while she wants them to have a relationship, she wants it to be a consistent one. That has not been demonstrated by the defendant, according to her testimony. She conceded that the child was happy when he visited with his father, and when he gave Austin more presents.
The plaintiff takes the child to The Unity Church in Bridgeport, and they visit her family in Shelton in the process. Sometimes those visits interferred with defendant's phone calls. On cross-examination, the plaintiff agreed that the statements made which cause her concern over the child, were made prior to their breakup, and prior in time to the pregnancy. She conceded that she would have married him, had he asked her, regardless of the statements concerning abuse already made.
Obviously the plaintiff has had to bear the burden of carrying, nurturing, and supporting this child alone. She has made serious efforts to ensure that the child was brought to California to visit with his father. The claims she makes concerning her fears are based primarily on her "overprotectiveness" as testified to by Ms. Horton, and some lingering doubts about the ability of the father to make a serious committment to stay fully involved in the life of this chld [child].
The defendant seeks to have implemented the recommendations of Family Services. The testimony of Dr. Begelman concurs, but for some belief that the time frame in which unsupervised visitation commences be extended. The basic format was acknowledge by Dr. Begelman to serve the best interests of Austin to increase the time he spends with his father. The court finds that the concerns of the mother surrounding the father's committment are well-place, but that her safety issues have been dealt with appropriately. While the court can find from the testimony and other evidence presented that the father has had a struggle reaching maturity, he has demonstrated through this court action, and his efforts in California, that he is ready to undertake the process of being a real father to his biological child. CT Page 11136
Based upon the findings of the court, the following orders are entered:
1. The parties shall seek a counselor to assist them in working out details of a visitation plan to follow. They shall endeavor to select a mutually agreeable counselor who is available to be paid, if possible, on medical insurance presently provided to the minor child by the defendant.
2. The child shall continue to be counseled by Dr. Begelman, to monitor Austin's reaction to his time with his father, and to assist the counselor who will see the parents. The court does not imply by this order that the parents not be able to select Dr. Begelman as their counselor. The court understands that the defendant may have some defensiveness at that suggestion because of Dr. Begelman's testimony, but the court feels that Dr. Begelman was a serious advocate for the child, and for the child's increased relationship with his father.
3. The court has articulated on the record a plan for father's visitation for the period until the defendant departs again for California over the weekend of September 16-17. The court anticipates that the spirit of its order has been followed.
4. The court orders that the father's visitation be expanded over the next year as recommended by the Family Services Unit. The court orders that the father be entitled to see the child each day he is in the State of Connecticut for the Thanksgiving holiday period, and that that visitation be supervised by agreed upon supervisors including Ms. Truiewicaz and Ms. Hume. During the Christmas holiday period, the defendant may enjoy at least one unsupervised visit, with the plans for the visit being specifically related to mother. The parties should work with the counselor to determine a most natural plan for that visit, so that the child sees extended family members to enjoy holiday traditions, and to spend time daily with his father for at least part of every day.
The father then should plan a spring or summer CT Page 11137 period in the State of Connecticut when he shall spend overnight time with the minor child within the State of Connecticut, and he shall allow the child to reunite with mother, should the child need to see mother during a more extended time with the father.
The parties shall report to the court, by arranging a meeting with Ms. Horton prior to that period of extended visitation, so the court can monitor their progress. The court will also be interested in hearing about the child's progress in school, medically, and psychologically concerning his relationship with his father and his peers. The parties will then have an opportunity to share information concerning his needs.
The defendant father shall have weekly telephone contact with the child at a mutually convenient time, which need not be during a weekend. It may make more sense for the telephone call to be made on a Wednesday evening at 5 p. m. or at a time when the rates are reduced. The child will be in his school routine, and the parties will not be able to create problems over what time the mother and son might return from southern Connecticut on a Sunday.
The defendant father shall write to the child at least twice per month, and the mother shall not ask to see the correspondence. The child shall be encouraged to continue to send greeting cards for holidays and birthdays to his dad. The court felt that the plaintiff had been a very positive influence on the child in that regard. The father shall send photographs of himself and his activities to the child. The father shall send to the child any photos he has of the two of them together, regardless of the age of the child when the photo was taken.
The court will thereafter allow the defendant father to arrange an extended visitation in the State of California, so that the child can meet the father's extended family, and spend time with the father in his home. The court expects that the father will endure whatever aggravation he complains about to see to it that he calls and communicates in all ways with the child during this time. The court recognizes that he may have CT Page 11138 some frustration, but the court is mindful of his inability to fully commit to his relationship with his son and mother's frustration and resentment to that. The parties must both focus on Austin's needs for this relationship, and renew their efforts to see that his needs have priority.
The court hopes, for Austin's sake, that the parties will end their dispute over this child. He lives primarily in the State of Connecticut, and certain care decisions have been made, as a matter of necessity and neglect, by the mother. Father is fully capable of having a positive influence in the child's life, and the child is entitled to that involvement. Both parents created this situation for their child, and it is their responsiblity [responsibility] to work through the problems they have created for their child. The court will not accept anything less.
These orders shall enter.
DRANGINIS, J.